UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DIVISION

| | |
|---|---|
| STANLEY ALLAN LEWIS, ) | Case No. SA CV 14-00769 (AS) |
| ) | |
| Plaintiff, ) | **MEMORANDUM OPINION AND** |
| ) | |
| v. ) | **ORDER OF REMAND** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Pursuant to Sentence 4 of 42 U.S.C. § 405(g), IT IS HEREBY ORDERED that this matter is remanded for further administrative action consistent with this Opinion.

**PROCEEDINGS**

On May 16, 2014, Plaintiff filed a Complaint seeking review of the denial of his application for Disability Insurance Benefits. (Docket Entry No. 1). The parties have consented to proceed before the undersigned United States Magistrate Judge. (Docket Entry Nos. 6, 8, 13). On September 29, 2014, Defendant filed an Answer along with the Administrative Record ("AR"). (Docket Entry Nos. 11-12). The parties filed a Joint Stipulation ("Joint Stip.") on November 26, 2014, setting

forth their respective positions regarding Plaintiff's claims. (Docket Entry No. 14).

The Court has taken this matter under submission without oral argument. See C.D. Cal. L.R. 7-15; "Order Re: Procedures In Social Security Case," filed May 20, 2014 (Docket Entry No. 4).

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On June 29, 2012, Plaintiff, formerly employed as an administrative assistant and as a financial advisor/consultant (see AR 43-44, 182, 225), filed an application for Disability Insurance Benefits, alleging an inability to work since December 1, 2010. (AR 166-72). On November 4, 2013, the Administrative Law Judge ("ALJ"), Sharilyn Hopson, heard testimony from Plaintiff, medical expert Dr. Ronald E. Kendrick, and vocational expert Jeanine Metildi. (See AR 42-67). On November 20, 2013, the ALJ issued a decision denying Plaintiff's application. The ALJ determined that Plaintiff had severe impairments -- "degenerative disc disease of the lumbar spine, lumbar disc protusion, and foraminal stenosis; cervical spondylosis with disc protrusion; gout; obesity; bipolar disorder; cannabis abuse; and anxiety disorder" -- but found that Plaintiff was not disabled within the meaning of the Social Security Act. (See AR 17-28).

Plaintiff requested that the Appeals Council review the ALJ's decision. (AR 11-12). The request was denied on April 2, 2014. (AR 1-5). The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision. See 42 U.S.C. §§ 405(g), 1383(c).

2

**PLAINTIFF'S CONTENTIONS**

Plaintiff makes two challenges to the ALJ's decision. Plaintiff alleges that the ALJ erred in failing to properly: (1) assess Plaintiff's credibility; and (2) evaluate the opinion of Plaintiff's treating physician. (See Joint Stip. at 6-13, 17-21).

**DISCUSSION**

After consideration of the record as a whole, the Court finds that Plaintiff's first claim of error does not have merit, and that Plaintiff's second claim of error has merit and warrants a remand for further consideration.

**A. The ALJ Properly Assessed Plaintiff's Credibility**

Plaintiff asserts that the ALJ failed to properly assess Plaintiff's credibility. (See Joint Stip. at 6-13). Defendant asserts that the ALJ provided valid reasons for finding Plaintiff only partially credible. (See Joint Stip. at 13-17).

Plaintiff made the following statements in a Function Report–Adult dated September 8, 2012: (1) he lives alone in an apartment; (2) he wakes up every day feeling depressed, tired, irritable, anxious, incoherent (it takes him several hours to think clearly and act rationally) and somewhat paranoid (his feelings last throughout the day); (3) even though he takes prescribed Ambien and Lithium at night, he is able to sleep only 3 to 4 hours (his condition is magnified by his insomnia), and he usually has to take a 1 to 2 hour nap because of his medications; (4) he takes prescribed Lithium, Prozac, Klonopin, Allopurinol and Lipitor daily; (5) he usually eats a bagel, cottage cheese or cereal for breakfast; (6) at night, he reads self-help books, attends support groups for depression, or watches movies and television;

3

(7) he has one cat who he feeds twice a day (the cat requires minimum care); when he is out at night (rarely), he asks a family member to feed the cat; (8) when he worked as a financial advisor/securities broker, he was able to work with diverse individuals and solve complex problems; his mental illness, depression, anxiety and self-doubt have made him unable to work as a financial advisor, to multi-task, to solve complex or long-term problems, to think clearly, to deal with stress, to sleep properly, or to leave the house sometimes; (9) with respect to his personal care: he dresses in whatever is clean or in his laundry basket (dressing is "the least of [his] concerns"); he does not bathe as much as he did before (not a priority); he does not take care of his hair (it is "irrelevant" to how he feels about himself); he has stopped shaving; he feeds himself "normally and without assistance"; and he uses the toilet on his own (but has to use the toilet at least 6 times a day due to stress and anxiety); (10) his family, friends and therapist occasionally remind him to dress "more formally" and shave; (11) his parents ask him every day whether he took his medications; (12) with respect to meals, he primarily cooks (microwaves) frozen dinners for lunch and dinner (but eats at his parents' home when he is too depressed to cook), and eats alone; since his illness began, he has less money to eat out and to prepare nutritional meals; (13) with respect to house and yard work: he has not cleaned his house in months; he cleans dishes 1 to 2 hours (every 2 weeks or when he runs out of clean dishes); he cleans the cat box 30 to 60 minutes (once or twice a week); he does his laundry 1 to 2 hours (every 2 weeks or when he runs out of clean clothes); he does not have to do outside maintenance or yard work (the apartment association takes care of it); his family and friends are always encouraging him to do his chores, with varying success (sometimes he cannot get motivated); (14) he goes outside approximately 4 to 5 times per week (he is able to go out alone), either walking, driving a car (he drives), or riding in a car; (15) he shops in stores for groceries (usually frozen food, but sometimes vegetables and fruits when affordable) 1 to 2 hours (every 1 to 2 weeks); (16) he is able to pay bills, count change, handle a savings account, and use a checkbook/money

orders, but his mental illness has made him less confident in handling money; (17) his hobbies and interests are hiking (weekly), walking (almost daily, "to help alleviate the stress, anxiety and irrational thoughts that cloud [his] reasoning and judgment"), listening to music (daily), using the computer (almost daily), reading (almost daily), and individual/group therapy (weekly or monthly); he has cut back on most of his activities because he finds it difficult to do the things he used to enjoy; (18) he spends time with family and a few close friends (4 to 5 times a week, depending on how he feels), and he regularly goes to the therapist's office, group therapy and Starbucks (he does not need to be reminded to go places); (19) he has problems getting along with family and friends, since his depression, anxiety and stress causes him to act out (he has lost several friends); he no longer has confidence in himself; (20) his condition affects his abilities in the areas of lifting, talking (he has difficulty expressing himself), hearing, memory (he cannot remember written or spoken instructions), completing tasks, concentration (he can pay attention for 2 to 5 minutes), understanding, following instructions, and getting along with others (family and friends, but he has no problems with authority figures or law enforcement); (21) he handles stress very poorly (he is working on it at therapy), and he does not handle changes in routine well; and (22) he wears prescription glasses.  (See AR 261-72).

At the administrative hearing, Plaintiff testified as follows:

> He last worked as an administrative assistant at his parents' business for a few months in 2010, from 2 to 10 hours a week.  He stopped working because his depression, anxiety and nervousness was harming his relationship with his parents.  Before that job, he had worked as a securities financial broker for eight different firms for about 14 years.  He had to stop working because his mood swings, anxiety and depression caused him to not think clearly, to not be able to multi-task, to miss work, and ultimately to take disability leave (his doctors finally encouraged him to resign).

5

After 2007, he suffered a steep drop in his income predominantly as a result of his bipolar depression. Since his administrative assistant job, he has not applied for other jobs (he no longer has a securities financial broker license because of the costs, and because he was not sure whether he could get back into the profession). He never received unemployment income. His source of income since 2010, his IRA, had decreased from $100,000 to about $8,000. (See AR 43-45, 53-55).

He lives with his cat in a house his parents bought about 30 years earlier. He feeds the cat and changes the litter "when [he] get[s] to it." He does not "do a lot of clean up or activities for [his] cat or [himself]." (See AR 45).

He has a driver's license and drives. (See AR 45-46).

He suffers depression, where his mood goes from extreme anxious to utter despair, 5 or 6 days a week. His depression makes him feel isolated (he does not go outside, shop, or eat (except granola bars). He has attempted suicide. After his last attempt 1 or 2 years ago -- at which time he took almost a bottle of Klonopin -- he called and left a message with his primary care physician, who then sent the police. He was not hospitalized, because he told the police he simply had taken a few extra medication and his doctor was overly concerned. (See AR 55-56).

He suffers anxiety, where he "always feel[s] uncomfortable inside or . . . always feel[s] like [he's] going to implode from the inside out." His anxiety attacks, which make him sweat profusely, have gotten worse. (He had his first attack at his first job 6 months after completing college.) The attacks are caused by different forms of stress. (See AR 56-57, 62).

He has problems with concentration; he has trouble completing coherent sentences. He has difficulty completing tasks (for example, there are many unfinished things in his house). He has difficulty getting along with people; his paranoia has caused him to lose the majority of his friends, he does not talk to his three siblings, and his relationship with his parents at the moment is okay. (See AR 57-58).

He has difficulty sleeping at night because of insomnia. The prescribed Ambien stopped working after more than a year, so his psychiatrist prescribed Trazodone. With medication, he is sleeping on average about 3 to 5 hours a night, but it is an interrupted sleep. He wakes up feeling groggy and irritable. He has to take a 1 to 2-hour nap every day.

He rarely drinks alcohol (only at a family function or at Thanksgiving). He does not do any non-prescribed drugs. He has a recommendation for a medical marijuana card (that came from a physician at a state-license physical), and he uses medical marijuana approximately once a night for insomnia and anxiety. (See AR 46-47).

He takes Prozac (an anti-depressant for bipolar), Xanax (for anxiety and panic attacks), Lithum, Ambien, Trazodone, Allopurinol (for gout), and a generic Lipitor. He takes the Trazadone sparingly, because it makes him wake up feeling groggy, irritable and anxious. He had tried taken Soroquel (which had been prescribed by another psychologist), but it did not work. (See AR 60-61).

He has been seeing Dr. Vaspus, a clinical psychologist, "on and off" since 1996. When asked about Dr. Vaspus' comment that she does not see him on a regular basis and that it is kind of hit and

miss, he said that he wishes he could see Dr. Vaspus more but he could not afford it (Dr. Vaspus is very expensive), and that for the past two years he had seen Dr. Vaspus approximately 2 times a month. (See AR 61-62).

He has pain his neck and lower back. He broke his neck in 1988 and felt a pop in his lower back (while lifting a box over his head) in 1995 or 1996. The pain in his neck is constant. The pain level in his neck in the morning is 2 or 3 (out of 10), and can go up to 7 or 8, depending on his level of activity (i.e., lifting, carrying, walking). The pain in his lower back at the hearing was about 3 to 4, and can go up to 7 or 8, depending on his level of activity (i.e., lifting over 20 pounds). He can sit for 20 to 30 minutes before he feels a piercing in his lower back and has to move around. (See AR 47, 52-53).

He has good and bad days. On a really bad day, he does not get out of bed, answer the phone, or do anything functional. On average, he has really bad days 3 to 4 days a week, if not more. (See AR 59).

He does not get out of the house very often. The last month he went out only a few times. (See AR 58).

He does household chores "literally when [he] get[s] around to it." He washes a dish when there is not a dish he can use. He does not cook, but uses the microwave. He goes shopping when he finally "break[s] down" and goes to the local supermarket. (See AR 59-60).

///
///
///

In the section addressing whether Plaintiff had an impairment or combination of impairments that met or medically equaled the severity of one the listed impairments (step three of the sequential evaluation process), the ALJ summarized Plaintiff's testimony in the Function Report-Adult. (See AR 20).[1]

The ALJ found that Plaintiff had the following residual functional capacity ("RFC")[2]: the ability to occasionally lift and/or carry 20 pounds and to frequently lift and/or carry 10 pounds;[3] stand and/or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally push and pull at the level of lifting and carrying; occasionally climb stairs, balance, stoop, kneel, and crouch; never climb ladders, ropes, or scaffolds, or crawl; occasionally reach overhead bilaterally; no exposure to hazardous heights and to moving and dangerous machinery; limited to simple repetitive tasks in an object-oriented work with only occasional changes in the work setting; no public contact; only occasional interaction with co-workers; and no jobs requiring teamwork. (See AR 22).

After briefly summarizing Plaintiff's hearing testimony (see AR 22) and after discussing the medical evidence of record (see AR 22-25), the ALJ made the following assessment of Plaintiff's credibility:

---

[1] Based on such testimony, the ALJ found that Plaintiff had moderate restriction in the activities of daily living, and moderate difficulties in social functioning, and moderate difficulties with respect to concentration, persistence and pace (this last determination was also based on the ALJ's observations of Plaintiff at the hearing). (See AR 20).

[2] A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's and his friend's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible for the reasons explained in this decision.

In terms of the claimant's credibility, the undersigned finds the claimant's allegations less than fully credible. The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The record reflects significant gaps in the claimant's history of treatment and relatively infrequent trips to the doctor for the allegedly disabling symptoms. Furthermore, the claimant's use of medications does not suggest the presence of impairments which is more limiting than found in this decision. Despite his impairments, the claimant has also engaged in a somewhat normal level of daily activity and interaction. The claimant admitted activities of daily living included personal care, pet care, preparing meals, washing dishes, laundry, paying bills, driving, shopping, hiking, walking, listening to music, using his computer, reading, going to individual and group therapy, getting together with family and friends, and going to Starbucks (Exhibits 8E, 6F/6, and Testimony).  In July 2012, he reported that he had recently started CrossFit (Exhibit 5F/12).  Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.  The undersigned finds the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations.  (AR 25).

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his pain and symptoms only by articulating clear and convincing reasons for doing so. Smolen v. Chater, supra; see also Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Here, substantial evidence supports the ALJ's finding that Plaintiff's testimony about the intensity, persistence and limiting effects of the symptoms was not fully credible.

First, the ALJ's finding that Plaintiff has "not generally received the type of medical treatment one would expect for a totally disabled individual" and "[t]he record reflects significant gaps in the claimant's history of treatment and relatively infrequent trips to the doctor for the allegedly disabling symptoms" (see AR 25) was a clear and convincing reason for partially discrediting Plaintiff's testimony. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)("The ALJ is permitted to consider lack of treatment in his credibility determination."); Fair v. Bowen, 885 F.2d 597, 603-04 (9th Cir. 1989)(stating that an adverse credibility determination can be based on "an unexplained, or inadequately explained, failure to seek treatment or to follow a prescribed course of treatment"). Although Plaintiff claimed that he had constant pain in his neck, and that he had suffered neck and lower back issues since 1995 or 1996 (see AR 47, 52-53), the record is very sparse with respect to his neck and/or lower back issues. (See AR 338-39 [Progress Notes, dated June 26, 2012, noting that

Plaintiff had lower back pain and was prescribed Klonopin]; AR 377-80 [a Hoag Memorial Hospital Presbyterian Emergency Physician Record, dated July 16, 2012, noting that Plaintiff, who had a history of chronic lower back pain, had exacerbated the pain after lifting weights, and that Plaintiff had been treating the pain with ice and with chiropractor visits, and diagnosing Plaintiff with acute low back pain and sciatica); AR 382-83 [An MRI of the lumbar spine on July 16, 2012 showed Plaintiff had: "moderate right and moderate-severe left foraminal stenoses secondary to posterior disc bulging and projecting osteophytes" (L5-S1); "moderate right and mild left neural foraminal stenosis" (L4-L5); and "[n]o significant spinal stenosis in the visualized lumbar spine" and "[n]o evidence of acute compression fracture]): and AR 465-71 [a Final Summary Narrative Report, dated February 21, 2008, discussing Plaintiff's chiropractic treatment for neck and lower back pain following an automobile accident on April 10, 2007, and stating that Plaintiff "has been placed on a supportive treatment basis as well as an as needed basis for pain management and relief."]).

Second, the ALJ's finding that Plaintiff's abilities to perform certain daily activities, such as personal care, pet care, preparation of meals, washing dishes, laundry, paying bills, driving, shopping, hiking, walking, listening to music, using the computer, reading, going to individual and group therapy, getting together with family and friends, and going to Starbucks (see AR 25, citing to AR 261-72 [Plaintiff's Function Report-Adult], 398 [Plaintiff's statements to the consultative psychiatrist], and Plaintiff's hearing testimony [see AR 43-47, 52-62]) was a clear and convincing reason for discrediting Plaintiff's testimony. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1999). Plaintiff went to great lengths to attempt to minimize his daily activities. (See AR 398 [Plaintiff stated he "has grown a beard and does not have a lot of interest in his appearance"]; AR 59 [Plaintiff's testimony that on "bad days" he does not get out of bed at all]; AR 262-

63 [Plaintiff's testimony that dress "is the least of [his] concerns, that he dresses in whatever is clean or sitting in his laundry basket, that he does not bathe as frequently as he used to because it is not a priority, that the condition of his hair is irrelevant to how he feels about himself, that he has stopped shaving, and that occasionally his family, friends and therapist tell him to dress "more formally" and shave]; AR 45, 263 [Plaintiff's testimony he takes care of his cat only when he "get[s] to it" and he does not do a lot of clean-up for the cat]; AR 59, 263, 398 [Plaintiff's testimony his meal preparation usually consists of putting a frozen meal into a microwave]; AR 263 [Plaintiff's testimony he washes dishes only every 2 weeks or when he runs out of clean dishes, he does laundry every 2 weeks or when he runs out of clean clothes, he does not always do those chores even when his family and friends encourage him to do them, and he does not have much interest in performing household chores]; AR 58, 398 [Plaintiff's testimony his outside activities are very limited, and he does not get out of the house very often]; AR 265 [Plaintiff's testimony he feels less confident about his ability to handle money]; AR 59-60, 264 [Plaintiff's testimony he only shops for food every 1 to 2 weeks or when he runs out of food, or when he finally "breaks down" and goes to the supermarket; and AR 57-58, 265, 267-68, 398 [Plaintiff's testimony that with regard to hiking, walking, listening to music, using the computer, reading, going to individual and group therapy, getting together with family and friends, and going to Starbucks, he does not do most of them daily, he has cut back on most of them since his illness began because he no longer enjoys them, he does not go out very often, his relationship with family members other than his parents is not very good, and he has lost several friends based on his erratic and irrational behavior]). Nonetheless, the ALJ properly found that Plaintiff's ability to participate in such activities undermined his credibility concerning his functional limitations because "[s]ome of the physical and mental abilities and social interactions required to perform those activities are the same as those necessary for obtaining

and maintaining employment." (AR 25). See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations."); Reddick v. Chater, supra ("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

Third, the ALJ's properly discredited Plaintiff's testimony about his symptoms and limitations based on Plaintiff's report that he started CrossFit in 2012 (see AR 25, citing to AR 384 [a discharge record from Hoag Memorial Hospital Presbyterian, dated July 16, 2012, noting that "chronic back pain patient recently started CrossFit]). Inconsistencies between a claimant's testimony and conduct may provide a basis to discredit a clamant's testimony. See Smolen v. Chater, supra, 158 F.3d at 1273; Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); Light v. Social Security Admin., supra, 119 F.3d at 792. This finding was a clear and convincing reason for discrediting Plaintiff's testimony.

Accordingly, the ALJ did not err in assessing Plaintiff's credibility.

**B.   The ALJ Did Not Properly Evaluate the Opinion of Plaintiff's Treating Psychologist**

Plaintiff asserts that the ALJ did not provide a clear and convincing reason, or a specific and legitimate reason, for rejecting the opinion of Dr. Basbas, Plaintiff's treating psychologist. (See Joint Stip. at 17-21). Defendant asserts that the ALJ properly rejected the opinion of Plaintiff's treating psychologist. (See Joint Stip. at 22-24).

14

Laurel A. Basbas, Ph.D. (psychologist) treated Plaintiff from December 1, 2010 to at least October 15, 2013 (50 sessions in 2010 through 2011, 5 to 7 sessions in 2012, 14 sessions in 2013). (See AR 406-407, 422-27, 530-48). On an unknown date in 2012, Dr. Basbas found that since December 1, 2012, Plaintiff has had bipolar disorder, extreme anxiety, and severe (debilitating) depression, which at times have made it difficult for him to leave his house, impaired his ability to communicate clearly and effectively, and slowed his thought processes. Dr. Basbas noted that Plaintiff often appears unkempt and disheveled, his posture is slumped, his bodily movements are slowed and awkward, and his speech includes some slurring and stammering. Dr. Basbas further noted the following: Plaintiff is indirectly uncooperative as a result of his inability to follow through on instructions; his interpersonal function is impaired (he frequently alienates friends, he has not sustained a long-term romantic partner, and has an ambivalent relationship with family; his self-care is poor (he does not sleep or eat healthily, he has abused alcohol); his affect appears inappropriate to content (he is at times angry, fearly, apprehensive, depressed and hopeless); his thinking, including attention span, abstract thinking, concentration, thought flow, is impaired); his daily functioning and ability to make reasonable life decisions appears to be impaired; his memory and understanding are fair, his concentration and persistent are very poor, and his social interaction and adaptation are very poor.

After stating that Plaintiff had a poor prognosis, Dr. Basbas concluded: "On the few occasions I see [Plaintiff], it is with the hope of helping him maintain some ability to function. His condition is so deteriorated that I have given up the hope of his getting a job and being a contributing member of society." (See AR 406-07). On an unknown date in 2013 (Plaintiff asserts it was February 12, 2013, see Joint Stip. at 18), Dr. Basbas made essentially the same findings and observations as those discussed above, but added that Plaintiff's speech is alternatively slowed and then pressured and that his thought flow is

15

alternatively decreased and slow, and at times, pressured and chaotic. Dr. Basbas diagnosed Plaintiff with bipolar disoreder and borderline personality disorder. Dr. Basbas gave Plaintiff a Global Assessment Functioning score of 35 ("major impariment in several areas").[4] After repeating the statements discussed above, Dr. Basbas concluded: "While [Plaintiff's] mental capabilities have deteriorated over the past several years, he is an intelligent man. He is capable of understanding instructions, and his short-term memory is intact. His concentration and persistence are impaired. His social interaction is poor in that he is irritable, reactive, and hyper-sensitive. He is not very adaptable, due to his emotional impairments." (See AR 422-25).

The ALJ addressed Dr. Basbas's opinion as follows:

> Dr. Laurel A. Basbas, the claimant's treating psychologist, concluded that the claimant's condition has so deteriorated over the past few years that Dr. Basbas has given up the hope of his getting a job and being a contributing member of society (Exhibits 7F/4, 9F/12). This opinion on an issue reserved to the Commissioner of Social Security is given less weight because it is not consistent with the record as a whole. (AR 26).

Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination

---

[4] A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"), 34 (2000).

of disability. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Magallanes v. Bowen, 812 F.2d 747, 751 (9th Cir. 1989). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 416.927(b)-(d). If the treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended). If the treating physician's opinion is contradicted by another doctor, the ALJ must provide "specific and legitimate reasons" for rejecting the treating physician's opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998); Lester v. Chater, supra; Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).

Here, the ALJ did not provide proper reasons for rejecting Dr. Basbas's opinions.

The ALJ properly found that Dr. Basbas' statement that "[Plaintiff's] condition is so deteriorated that I have given up the hope of his getting a job and being a contributing member of society" was an issue reserved for the Commissioner." See 20 C.F.R. § 404.1527(d)(1) ["A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine you are disabled."].

However, contrary to Defendant's assertion (see Joint Stip. at 23-24), the ALJ's statement that Dr. Basbas' opinion was "not consistent with the record as a whole" was an insufficient basis for giving less weight to Dr. Basbas's opinion. First, the ALJ failed to specify the medical evidence that did not support Dr. Basbas's opinion. Second, the ALJ's statement was expressly limited to Dr. Basbas' opinion about Plaintiff's inability to work. Third, and most importantly, the ALJ failed to address Dr. Basbas's opinions about Plaintiff's limitations

17

which served as the basis for her opinion that Plaintiff was unable to work, including Dr. Basbas' opinion that Plaintiff's ability to communicate clearly and effectively is impaired; Plaintiff's interpersonal functioning is impaired; Plaintiff's abilities with regard to attention span, abstract thinking and concentration are impaired; Plaintiff's daily functioning is impaired; Plaintiff's abilities with regard to memory and understanding are fair; and Plaintiff's abilities with regard to concentration and persistence are very poor; and Plaintiff's abilities with regard to social interaction and adaptation are very poor.[5]

## C.  Remand Is Warranted

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000). Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. Id. at 1179 ("[T]he decision of whether to remand for further proceedings turns upon the likely utility of such proceedings."). However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate. McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011); Harman v. Apfel, supra, 211 F.3d at 1179-81.

Since the ALJ failed to properly reject the opinion of Plaintiff's treating psychologist, remand is appropriate. Because outstanding issues must be resolved before a determination of disability can be

---

[5]  The Court will not consider reasons for finding Dr. Basbas' opinion less credible (see Joint Stip. At 23-24) that were not given by the ALJ in the Decision. See Pinto v. Massanari, 249 F.3d 840, 847-48 (9th Cir. 2001); SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).

made, and "when the record as a whole creates serious doubt as to whether the [Plaintiff] is, in fact, disabled within the meaning of Social Security Act," further administrative proceedings would serve a useful purpose and remedy defects. Burrell v. Colvin, 775 F.3d 1133, 1141 (9th Cir. 2014)(citations omitted).

**ORDER**

For the foregoing reasons, the decision of the Commissioner is reversed, and the matter is remanded for further proceedings pursuant to Sentence 4 of 42 U.S.C. § 405(g).

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: July 23, 2015

/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE